**Affirmed in Part, Reversed and Remanded in Part, and Majority Opinion and Concurring and Dissenting Opinion filed May 31, 2012.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-10-00971-CV

---

**CITY OF HOUSTON, Appellant**

**V.**

**SHAYN A. PROLER, Appellee**

---

**On Appeal from the 234th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2007-30944**

---

## MAJORITY OPINION

The City of Houston appealed to a district court an independent hearing examiner's award in favor of Shayn A. Proler. Proler filed a counterclaim against the City under the Americans with Disabilities Act ("ADA") and the Texas Commission on Human Rights Act ("TCHRA"). The trial court dismissed for want of jurisdiction the City's claims and rendered judgment in favor of Proler, awarding him injunctive relief and attorney's fees.

On appeal, the City presents five issues: (1) the evidence is legally and factually insufficient to support the jury's finding that the City engaged in employment

discrimination; (2) the trial court erred by refusing the City's proffered jury instructions; (3) the trial court erred by awarding Proler attorney's fees; (4) the trial court erred by granting Proler injunctive relief; and (5) the trial court erred by dismissing for want of jurisdiction the City's petition. We affirm in part and reverse and remand in part.

## I. BACKGROUND

In the early 1990s, Proler joined the Houston Fire Department ("HFD"). During 2002, he was promoted to captain and worked at a fire-suppression station where he supervised multiple firefighters.[1] In 2004, Executive Assistant Chief Hector Trevino received a letter in which allegations were made that Proler was "scared to go into fires," leaving his crew to suppress fires unsupervised. Chief Trevino transferred Proler to an HFD training academy. Proler had various administrative responsibilities at the academy but was not involved in fire suppression. According to Proler, members of HFD consider the transfer of a non-injured firefighter to the academy as a disciplinary action.

Proler remained stationed at the academy for more than a year. During this time, HFD denied Proler's requests for transfer to a suppression unit. Eventually, Chief Trevino agreed to transfer Proler if Proler could find a senior captain who would allow Proler to join his suppression unit and evaluate Proler for several months. Proler met with District Chief John C. Seamans and Senior Captain Roosevelt Johnson to discuss Proler's joining suppression station 59. Proler assured Chief Seamans and Captain Johnson that Proler's reputation for fear of firefighting was unfounded. Captain Johnson permitted Proler to join station 59.

During Proler's tenure at station 59, Captain Johnson completed three written evaluations regarding Proler. In each evaluation, Captain Johnson gave Proler an overall rating of "effective" or "strong." However, during the same time, several unnamed firefighters made "off the record" complaints to Chief Seamans, alleging Proler was

---

[1] Generally, a suppression station is manned by multiple firefighters, an engineer, a captain and/or senior captain, and possibly a chief. The purpose of a suppression unit is to respond to a variety of emergencies, including suppression of building fires.

"either afraid of firefighting or that his 'head goes out on him' when faced with severe fire conditions." Chief Seamans did not take action based on these complaints but decided to continue evaluating Proler's performance.

On March 26, 2006, station 59 and other units responded to a building fire. At the scene of the fire, Captain Johnson gave Proler several orders, including an order to protect an adjacent building. Proler failed to complete any of his assignments. Proler also did not comply with Captain Johnson's repeated orders to wear his uniform properly. At one point, Captain Johnson found Proler standing in a smoke-filled room. Proler was extracted and received medical attention. Medics determined Proler's blood pressure was low. Johnson and others suggested that Proler seek treatment at a hospital, but Proler refused. Eventually, Proler was ordered to seek treatment. Proler was diagnosed as having suffered an episode of global transient amnesia.

After the March 2006 fire, Captain Johnson sent a letter to Chief Seamans, expressing concerns regarding Proler's behavior during the incident. In turn, Chief Seamans sent a letter to Fire Chief Phil Boriskie and Chief Trevino elaborating on these concerns. In light of these letters, Chief Trevino transferred Proler to the academy. Thereafter, Proler requested a transfer to a fire suppression unit, which Chief Trevino denied.

Proler challenged the transfer denial through the administrative grievance process.[2] After his step II grievance was unsuccessful, Proler appealed to an independent hearing examiner.[3] During May 2007, the hearing examiner signed an order, directing HFD to transfer Proler to a suppression station and pay him certain lost compensation. Pursuant to the hearing examiner's award, the City transferred Proler to a suppression unit and paid him lost compensation.

---

[2] *See* Tex. Loc. Gov't Code Ann. §§ 143.127–.134 (West 2008 & Supp. 2011).

[3] *See* Tex. Loc. Gov't Code Ann. §§ 143.057; 143.1016 (West 2008); 143.129(d) (West Supp. 2008).

3

The City appealed the hearing examiner's award to a district court, asserting that the court had jurisdiction under the Local Government Code and the Declaratory Judgments Act.[4] In his counterclaim under the ADA and TCHRA, Proler alleged that the City discriminated against him based on perceived disability. Proler filed a plea to the jurisdiction, arguing that the trial court lacked jurisdiction over the City's appeal. The trial court granted the plea and dismissed the City's claims for want of jurisdiction.

Following trial on Proler's claim, the jury found that the City discriminated against Proler based on perceived disability. However, the jury awarded no damages. The trial court rendered judgment on the jury's verdict but also awarded Proler injunctive relief and attorney's fees.

## II. LEGAL AND FACTUAL SUFFICIENCY

In its first issue, the City contends the trial court erred by denying the City's motion for directed verdict or motion for judgment notwithstanding the verdict because the evidence is legally insufficient to support a finding that Proler was "disabled" as defined under the TCHRA and ADA. Appellant also challenges factual sufficiency of the evidence.

### A. Standard of Review

We review a trial court's ruling on a motion for directed verdict or a motion for judgment notwithstanding the verdict under a legal-sufficiency standard. *City of Keller v. Wilson*, 168 S.W.3d 802, 823–24 (Tex. 2005); *Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 626 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). A legal-sufficiency point must be sustained when (1) there is a complete absence of evidence regarding a vital fact, (2) rules of law or evidence preclude according weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital

---

[4] *See* Tex. Loc. Gov't Code Ann. §§ 143.057(j); 143.1016(j); Tex. Civ. Prac. & Rem. Code Ann. § 37.004 (West 2008).

fact. *Keller*, 168 S.W.3d at 810. Under the legal-sufficiency standard, we must credit evidence that supports the judgment if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not. *Id.* at 827. If the evidence falls within the zone of reasonable disagreement, we may not invade the fact-finding role of the jurors, who alone determine the credibility of witnesses, weight to give their testimony, and whether to accept or reject all or any part of that testimony. *Id.* at 822; *Hartland v. Progressive Cnty. Mut. Ins. Co.*, 290 S.W.3d 318, 321–22 (Tex. App.—Houston [14th Dist.] 2009, no pet.). We must determine whether the evidence at trial would enable reasonable and fair-minded persons to find the facts at issue. *Keller*, 168 S.W.3d at 827.

When reviewing a challenge to factual sufficiency of the evidence, we examine the entire record, considering both the evidence in favor of, and contrary to, the challenged finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam). After considering and weighing all the evidence, we set aside the fact finding only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Garza v. Slaughter*, 331 S.W.3d 43, 45 (Tex. App.—Houston [14th Dist.] 2010, no pet.). The amount of evidence necessary to affirm a judgment is far less than that necessary to reverse a judgment. *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 616 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

## B. Analysis

In the jury charge, the trial court submitted the following question and instructions regarding the alleged unlawful employment practice, which mostly track the Texas Pattern Jury Charge[5]:

> Was disability (as defined below) a motivating factor (as defined below) in the [City's] decision to transfer [Proler] to the training academy of [HFD] from March 28, 2006 until May 25, 2007?

---

[5] *See* Texas Pattern Jury Charges PJC 107.6, 107.11 (2008).

5

A "motivating factor" in an employment decision is a reason for making the decision at the time it was made. There may be more than one motivating factor for an employment decision.

"Disability" means being *regarded as* having a mental or physical impairment that *substantially limits at least one major life activity*.

The term "mental or physical impairment" means any physiological disorder, condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory (including speech organs); cardiovascular; reproductive; digestive; genitourinary; hemic; lymphatic; skin; and endocrine; or any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

"Major life activities" means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, thinking[6] or working.

*"Substantially limits" (as applied to "major life activities" other than "working") means* that an individual is unable to perform a major life activity that the average person in the general population can perform or *that an individual is significantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity*.

"Substantially limits" (as applied to the "major life activity" of "working") means that an individual is restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working

"Substantially limits" (as applied to the "major life activity" of "performing manual tasks") means that an individual is prevented or

---

[6] At the time of trial, "thinking" was not specifically defined as a major life activity in the TCHRA or ADA. However, neither party objected to the inclusion of "thinking." Thus, we review sufficiency of the evidence based on the charge actually submitted. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000). Regardless, courts have held that "thinking" is a major life activity. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 307 (3d Cir. 1999). Moreover, in the current TCHRA and ADA, "thinking" is defined as a major life activity. *See* 42 U.S.C.A. § 12102(2)(A); 29 C.F.R. § 1630.2(i)(1)(i); Tex. Lab. Code Ann. § 21.002(11-a) (West Supp. 2011).

severally restricted from doing activities that are of central importance to most people's daily lives.

*"Being regarded as having such an impairment"* means an individual: (a) has a physical or mental impairment that does not substantially limit a major life activity but is perceived by the employer as having such a limitation; (b) has a physical or mental impairment that substantially limits a major life activity only as a result of the attitudes of others toward the impairment; or (c) *does not have an impairment at all, but is regarded by the employer as having such a substantially limiting impairment.*[7]

The City contends the evidence is legally and factually insufficient to support a finding the City regarded Proler as having an impairment that substantially limited a major life activity. We disagree. The following evidence supports a finding that the City regarded Proler as significantly restricted regarding the conditions under which he could "think" as compared to the conditions under which the average person is able to "think."

- Proler provided the following testimony regarding his behavior during the March 2006 fire. While en route to the fire, Proler attempted to grab his equipment but his hand "didn't necessarily cooperate. I'd miss it. I'd miss by several inches. . . . And I knew something was clearly wrong at that time." After arriving at the scene and receiving orders, "it was obvious to [Proler] something was unusual, because [he] was having difficulty walking and doing stuff that [he] would normally consider routine." "Eventually somebody . . . grabbed [Proler] by [his] left arm and physically took [him] to the house next door, and sat [him] on a 5-gallon bucket that was turned upside down. And from . . . sitting on that 5-gallon bucket to talking here today, . . . everything has been normal."[8]

- Chief Trevino made the decision to transfer Proler to the academy in March 2006 and deny his requests for a transfer back to a suppression unit. According to Chief Trevino, he made these decisions based on letters written by Chief Seamans and

---

[7] We emphasize those portions of the instructions pertinent to our sufficiency analysis.

[8] During cross-examination, the City impeached Proler's trial testimony regarding his recollection of the March 2006 fire. The City presented Proler's deposition testimony that he was in and out of consciousness during the incident. In response to the impeachment, Proler admitted he is unable to testify regarding what transpired during "several seconds" at the fire scene; however, Proler also testified that he never lost consciousness and was referring to physical abnormalities when he mentioned "consciousness" during his deposition. It was within the province of the jury to determine what portions, if any, of Proler's testimony to believe.

Captain Johnson, in addition to Chief Trevino's past experience regarding Proler's reputation for being "scared to go into fires."

- In his letter, Captain Johnson explained that during the March 2006 fire, Proler (1) left his uniform open despite repeated orders to dress properly, (2) responded he understood orders but failed to complete any assignments, (3) did not supervise or direct his firefighters, and (4) stood in the center of a smoke-filled room as if "in shock." Captain Johnson noted that he realized Proler was "not functioning rationally" and "there could possibly be something medically wrong with him." Captain Johnson also noted medics determined Proler had low blood pressure. Finally, Captain Johnson opined Proler "could not function at all" for one of two reasons: "Either he was scared . . . or there was an acute medical emergency that consumed him."

- In his letter, Chief Seamans acknowledged receipt of Captain Johnson's letter and added the following information regarding Proler's behavior and condition during the March 2006 fire: (1) Proler seemed disoriented and could not follow or give orders; (2) Proler would nod in affirmation when given orders, but then murmur to himself and make "motions that were not sensible, such as fiddling with a redline nozzle that had been laid upon the ground for exposure protection"; (3) an HFD chief present at the time told Johnson "that something was not right" with Proler; (4) Proler was "very pale and appeared to be weak and wobbly"; (5) Proler had low blood pressure and possibly low blood sugar; and (6) Proler's diagnosis at the hospital might have been "slight stroke and/or other acute medical condition." Chief Seamans requested a "full investigation and evaluation" and stated, "If [Proler] has some type of medical or psychiatric condition that precludes his safe behavior at fire or other emergency scenes, then he should be removed from emergency response work until such time as the situation is resolved." Chief Seamans also detailed Proler's past and present reputation for having a fear of firefighting and disclosed that other firefighters have said Proler's "head goes out on him" when faced with severe fire-suppression conditions.

- Chief Trevino testified that based on the information contained in these letters, he had safety concerns because Proler had been unable to dress properly, respond to simple orders, or lead his firefighters. Chief Trevino interpreted Chief Seaman's request as asking "for [HFD] to get to the bottom of what happened out at the fire scene; what's at issue with Captain Proler." Chief Trevino testified that he transferred Proler "until we could sort things out as far as what difficulties he was . . . dealing with." According to Chief Trevino, he told Proler that he would be transferred until further notice because Chief Trevino "needed to talk to some other people . . . to see what we were going to do about it."

- After Proler was evaluated at the scene of the March 2006 fire, he was brought by ambulance to a hospital where he remained for several days. Shortly thereafter, HFD received a document in which a doctor indicated that Proler had suffered an episode

8

of global transient amnesia. The doctor released Proler to "full duty" beginning April 1, 2006.

- Chief Boriskie testified that HFD requested a medical evaluation of Proler and was informed he had suffered an episode of global transient amnesia. HFD sent a letter to James Ferrendelli, M.D., requesting clarification regarding whether Proler would suffer a recurrence of amnesia and whether he could safely perform the duties of an HFD captain. Enclosed with HFD's letter was a document detailing Proler's job description. Both Chief Boriskie and Chief Trevino testified that Dr. Ferrendelli failed to clarify these issues in his subsequent response.

- Following the March 2006 fire, Proler was not allowed to transfer from the academy for thirteen months, at which time HFD transferred him to a suppression unit pursuant to the hearing examiner's award. While Proler was stationed at the academy, HFD never required him to submit to a medical examination.

- According to Proler, at the time of trial, he had been working in a fire suppression unit for between one and two years and had not suffered any similar amnesia episodes during that time. Proler also testified that he is unaware of "any medical, physical or mental condition [he has]" that creates a safety issue for him or his firefighters.

Considering these facts in the light most favorable to the jury's verdict, we conclude the evidence is legally and factually sufficient to support the verdict. As noted above, the jury was charged that it could find the City regarded Proler as having a substantially limiting impairment if Proler "[1] does not have an impairment at all, [2] but is regarded by the employer as having such a substantially limiting impairment."

Regarding the first part of this definition, Proler testified he had not suffered amnesia since being transferred to a suppression unit over one year before trial and does not have any medical condition that poses a safety concern to him or his firefighters. Additionally, the emergency-room doctor who treated Proler following the March 2006 fire released Proler to full-duty action beginning April 1, 2006. This evidence is legally sufficient to support the jury's finding Proler does not, in actuality, suffer from an impairment. Moreover, this evidence is not so contrary to the overwhelming weight of the evidence as to render the jury's finding clearly wrong and unjust. In sum, the jury could have reasonably found that Proler's episode of amnesia was an isolated incident— not a substantially limiting impairment.

9

We also conclude the evidence supports the jury's finding regarding the second part of the "regarded-as" definition—did the City regard Proler as having a substantially limiting impairment? During the March 2006 fire, Proler was unable to follow orders or dress properly, and he muttered, wobbled, and stood in a smoke-filled room, appearing to be in a state of "shock." Captain Johnson opined that Proler was unaware of his surroundings and "could not function at all." Proler also engaged in nonsensical actions, such as "fiddling" with a nozzle. Several individuals opined that something was medically wrong with Proler, and he was later diagnosed as having suffered global transient amnesia. In the past, other firefighters had complained that Proler's "head goes out on him" when he faces severe fire conditions. After receiving a medical report in which Proler was cleared to return to full-duty action, HFD asked Dr. Ferrendelli to clarify whether Proler would suffer amnesia in the future and whether he could continue to perform as an HFD captain. According to Chief Boriskie and Chief Trevino, Dr. Ferrendelli's response was unsatisfactory. However, instead of sending Proler to a doctor for further evaluation, HFD refused to transfer Proler from the academy for thirteen months, at which time HFD acquiesced to the hearing examiner's award and transferred Proler to a suppression unit.

When determining whether the employer regarded the plaintiff as disabled, we must consider the employer's state of mind at the time the alleged discrimination occurred; this determination is predicated on the specific facts of each case and usually must be proved by circumstantial evidence. *See Ross v. Campbell Soup Co.*, 237 F.3d 701, 706 (6th Cir. 2001). We conclude the evidence supports a finding the City regarded Proler as having a recurring physiological or mental impairment that caused him to suffer episodes during which his cognitive ability was diminished to the point he was unaware of his surroundings for at least several minutes. Axiomatically, the average person in the general population does not suffer similar episodes. Hence, the jury could have reasonably found that the City regarded Proler as significantly restricted relative to the condition, manner, or duration under which he was able to perform the major life activity

10

of "thinking" compared to the condition, manner, or duration under which the average person in the general population is able to "think." *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 309 (3d Cir. 1999) ("Chronic, episodic conditions can easily limit how well a person performs an activity as compared to the rest of the population."); *see also Otting v. J.C. Penney Co.*, 223 F.3d 704, 710–11 (8th Cir. 2000) (determining evidence that plaintiff suffered from thirty-second to two-minute long seizures two or three times a month during which she was unable to see, hear, speak, walk, or work (and would suffer after-effects for ten minutes to three days) sufficient to support finding plaintiff was disabled).[9]  Accordingly, we conclude the evidence is legally sufficient to support a finding that the City erroneously believed Proler was disabled as defined in the jury charge.[10]

---

[9] We recognize that the United States Supreme Court declared the phrase "substantially limited" should be "interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg., Ky, Inc. v. Williams*, 534 U.S. 184, 196–97 (2002).  The Supreme Court defined "substantially limited" as "an impairment that prevents or severely restricts."  *Id.*  In this context, "severe" means "of a great degree."  Webster's Ninth New Collegiate Dictionary 1078 (9th ed. 1991).  However, in Proler's jury charge, "substantially limited" was defined as something that "significantly restricts."  "Significant" means "of a noticeably or measurably large amount."  *Id.* at 1096.  Based on these definitions, it is easier for a party to establish a "significant restriction" than a "severe restriction."  We hold that the jury could have reasonably determined the City regarded Proler as restricted by "a noticeably large amount" in his ability to "think" compared to the average person's ability to "think."  We cannot conclude it was unreasonable for the jury to determine that an inability to "think," even if intermittent, was a significant restriction.

[10] We disagree with our dissenting colleague that reasonable and fair-minded jurors could not conclude the City regarded Proler as suffering from a substantially limiting impairment as defined in the jury charge.  Despite receiving an inadequate response from Dr. Ferrendelli regarding Proler's medical condition, the City retained Proler at the academy for over a year without requiring him to undergo additional medical testing.  This evidence supports a finding the City believed that, at any moment, Proler might suffer a debilitating episode during which he is unable to the "think" normally.  The jury could have reasonably determined that HFD (1) would not have requested additional information from Dr. Ferrendelli if HFD had transferred Proler solely because of his fear of firefighting or (2) would have ordered additional medical testing if HPD were unsure whether Proler's condition was merely a temporary, singular occurrence.

We also note that under the definition of "motivating factor" in the jury charge, the City committed employment discrimination if it decided to transfer Proler because he was afraid of fire suppression *and* suffered from a disability.  Thus, evidence supporting a finding that Proler's supervisors considered him to be afraid of firefighting is not detrimental to the jury's finding.

We also conclude the evidence is factually sufficient to support the jury's verdict. Admittedly, the evidence supports a finding that the City transferred Proler because it believed he feared firefighting and was unfit to supervise a suppression unit, not because he was disabled. Nevertheless, as described above, there is also evidence supporting a finding that the City regarded Proler as having a recurring disability. In their letters, Captain Johnson and Chief Seamans explained that Proler may have been suffering from an acute medical condition. Chief Trevino testified that he retained Proler at the academy because Chief Trevino was unsure of the nature of Proler's condition. Further, in HFD's letter to Dr. Ferrendelli, HFD recognized Proler had been diagnosed as having suffered global transient amnesia and released to full-duty work, but inquired whether Proler would suffer a relapse and whether he could safely perform the functions of a fire-suppression captain. After receiving an unsatisfactory response from Dr. Ferrendelli, HFD did not conduct further medical inquiry into Proler's condition and refused to transfer him from the academy. Chief Trevino admitted he never received any information indicating that Proler was unable to discharge his duties as captain. This evidence supports a finding that the City regarded Proler as suffering from recurring episodes during which he was unable to "think." This finding is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176.

Accordingly, we conclude the evidence is legally and factually sufficient to support the jury's verdict and overrule Proler's first issue.

### III. JURY CHARGE

In its second issue, the City contends the trial court erred by refusing to submit the City's proffered instructions in the jury charge.

### A. Standard of Review

A trial court's decision whether to submit a particular instruction in its charge is reviewed for abuse of discretion. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex. 2006)

(per curiam).  When a trial court refuses to submit a requested instruction, the relevant question on appeal is whether the requested instruction was reasonably necessary to enable the jury to render a proper verdict.  *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex. 2000).  The trial court has great latitude and considerable discretion to determine the necessary and proper jury instructions, and any error regarding a requested instruction will not be reversed unless it probably caused rendition of an improper judgment.  *Louisiana–Pacific Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998).

## B.  Analysis

The City complains regarding the trial court's refusal to submit two instructions.  First, the City offered the following expanded definition of "substantially limits" as applied to the major life activity of working; the italicized sentences are those added by the City:

> "Substantially limits" (as applied to the major life activity[] of "working") means that an individual is restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities.  *To be substantially limited in the major life activity of working, then, one must be precluded from more than one type of job, a specialized job, or a particular job choice.  The impairment must substantially limit employment generally.*  The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.  *A physical or mental impairment that affects the claimant's ability to engage in a narrow range of jobs only or a particular job alone does not "substantially limit" one or more major life activities.*

(citations omitted, emphasis added).

Second, the City submitted the following instruction regarding "temporariness":

> Merely having an impairment does not make one disabled for purposes of the discrimination laws.  In order to prevail, Proler must have shown that [HFD] treated him as if he had a substantially limiting impairment.  To be considered a disability, the impairments [sic] impact must be permanent or

13

long-term. Temporary, non-chronic impairments of short duration, with little or no permanent long-term impact are not disabilities.

(citations omitted).

We hold that the trial court did not err by refusing the City's requested definition for "substantially limits" as applied to "working." The additional sentences merely reiterate the other sentences in instruction (which were submitted to the jury), namely, that an impairment substantially limits Proler's ability to work only if the impairment restricts his ability to perform a wide range of jobs. The trial court acted within its discretion by refusing this definition.[11]

Regarding the "temporariness" instruction, we agree that an impairment must generally be permanent or long-term, not merely temporary, to qualify as a disability under the ADA and TCHRA. *See, e.g.*, *Columbia Plaza Med. Ctr. of Fort Worth Subsidiary, L.P. v. Szurek*, 101 S.W.3d 161, 166–68 (Tex. App.—Fort Worth 2003, pet. denied) ("An impairment simply cannot be a substantial limitation on a major life activity if it is expected to improve in a relatively short period of time."); *see also* 29 C.F.R. pt. 1630, app. § 1630.2(j) (2010 version) ("[T]emporary, non-chronic impairments of short duration, with little or no long term or permanent impact, are usually not disabilities."). We also recognize Proler testified his amnesia was an isolated occurrence and that, days after the incident, a physician cleared Proler for return to full-duty work. These facts strongly support a finding that Proler suffered a temporary impairment on the day of the fire. However, Proler's theory of liability was not whether he was actually disabled but whether the City regarded him as disabled. It is undisputed the City refused to transfer Proler from the academy for more than a year, at which time the City transferred Proler only because of the hearing examiner's order. These facts strongly support a finding that the City did not regard Proler's impairment as temporary, but permanent and recurring.[12]

---

[11] We also note that Proler argued to the jury the major life activity of working was inapplicable and should not be considered. Accordingly, even if the court erred by refusing the City's definition, such error was harmless.

[12] During closing statements, Proler argued,

14

Thus, we hold that the trial court's refusal to submit the instruction, even if erroneous, did not probably cause rendition of an improper judgment. The City's second issue is overruled.

## IV. INJUNCTIVE RELIEF

We next address the City's fourth issue, in which the City contends the trial court erred by granting Proler's request for an injunction because no evidence supported such relief. The trial court awarded the following injunctive relief:

> In accordance with the jury's verdict that the City acted with respect to [Proler] in violation of state and federal law proscribing employment discrimination on account of perceived disability, and evidence from which the court finds that Proler and individuals similarly situated should be protected from future unlawful conduct, it is
>
> ORDERED that the City of Houston shall not in any manner further discriminate against [Proler] or retaliate against [Proler] because of his claims of discrimination, the presentation of the grievance related thereto, and the filing of his counterclaim.
>
> ORDERED that the City of Houston shall not discriminate in its assignments of [Proler] because of any perceived physical or mental impairment without utilizing the proceedings required by Tex. Loc. Gov't Code § 143.1115(a).

Under section 21.258 of the Labor Code, "On finding that a respondent engaged in an unlawful employment practice as alleged in a complaint, a court may: (1) prohibit by injunction the respondent from engaging in an unlawful employment practice; and (2) order additional equitable relief as may be appropriate." Tex. Lab. Code Ann. § 21.258(a) (West 2006). The injunctive relief afforded under this statute results in a permanent injunction because the statute requires a finding on the ultimate issue in an employment-discrimination case. *San Antonio Water Sys. v. Odem*, No. 04-07-00130-

---

Well, the City and [HFD] would say: [Proler was incapacitated for] maybe just one incident. Maybe he was - - he could be considered disabled at that particular point and for those days, but that would not have anything to do over a long period of time. Well, how can they assert that and argue that, if for more than one year Chief Trevino would not let him get out of the assignment to a training academy, because of the information he had received which, as I have shown you, very specifically met the test of a disability?

15

CV, 2007 WL 2376147, at *4 (Tex. App.—San Antonio Aug. 22, 2007, no pet.) (mem. op.). Generally, to establish entitlement to a permanent injunction, the requesting party must plead and prove the following: (1) a wrongful act; (2) imminent harm; (3) irreparable injury; and (4) no adequate remedy at law. *Jordan v. Landry's Seafood Rest., Inc.*, 89 S.W.3d 737, 742 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). However, the parties disagree regarding whether Proler must satisfy the general permanent-injunction elements under section 21.258.

The City argues that the applicant for an injunction under section 21.258 must prove the general elements for a permanent injunction.[13] The City relies on *Town of Palm Valley v. Johnson*, 87 S.W.3d 110 (Tex. 2001) (per curiam). In *Johnson*, the court of appeals held that an injunction may be granted under section 65.011(1) of the Civil Practice and Remedies Code without demonstrating irreparable injury. *Id.* at 110. Under section 65.011(1), "A writ of injunction may be granted if . . . the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant." *Id.* (quoting Tex. Civ. Prac. & Rem. Code Ann. § 65.011(1)). In a per curiam opinion denying the appellant's petition for review, the Supreme Court of Texas concluded, "[T]he statute does not permit injunctive relief without the showing of irreparable harm otherwise required by equity. If it did, the statutory remedy would simply replace the equitable [right to injunctive relief], which requires the additional showing." *Id.* at 111; *see also Kendall Appraisal Dist. v. Cordillera Ranch, Ltd.*, No. 04-03-00150-CV, 2003 WL 21696901, at *2–3 (Tex. App.—

---

[13] Proler sought an injunction under both section 21.258 and the federal counterpart provision, 42 U.S.C.A. § 2000e-5(g)(1) (incorporated into the ADA by 42 U.S.C.A. § 12117). In its appellate brief, the City cites Texas cases for the proposition that applicants for statutory injunctive relief must prove irreparable injury and no adequate remedy at law; the City does not cite any Texas or federal cases involving the requirements for obtaining federal statutory injunctive relief. The City concludes the argument section of this issue by contending, "Plaintiff has not [established he is] currently suffering an irreparable injury as a result of any alleged violation of the ADA or the TCHRA." We conclude the City waived any argument that the trial court erred by issuing the injunction based on the federal provision because the City did not support this argument with citation to any authorities. *See* Tex. R. App. P. 38.1(i).

San Antonio July 23, 2003, no pet.) (mem. op.) (recognizing *Johnson* court held applicant for injunction under section 65.011(1) must prove irreparable harm).

In contrast, Proler contends section 21.258 dispenses with the general equitable elements and provides the trial court discretion to grant injunctive relief upon a finding that an employer committed an unlawful employment practice. Proler argues that *Johnson* is inapplicable because it concerned the general injunction statute, whereas many courts have recognized an applicant need not prove the general equitable elements, such as imminent harm, irreparable injury, and inadequate remedy at law, when seeking injunctive relief provided by a specific statute. *See, e.g.*, *State v. Tex. Pet Foods, Inc.*, 591 S.W.2d 800, 804–05 (Tex. 1979) ("The doctrine of balancing the equities has no application to this statutorily authorized injunctive relief."); *8100 N. Freeway Ltd. v. City of Houston*, 329 S.W.3d 858, 861 (Tex. App.—Houston [14th Dist.] 2010, no pet.) (involving section 243.010 of Local Government Code, providing municipality or county may seek injunctive relief to prohibit violation of regulations pertaining to sexually oriented businesses); *Marauder Corp. v. Beall*, 301 S.W.3d 817, 820 (Tex. App.—Dallas 2009, no pet.) (involving Debt Collection Act, providing person may sue for injunctive relief to prevent violation of the act); *Avila v. State*, 252 S.W.3d 632, 648 (Tex. App.—Tyler 2008, no pet.) (involving section 17.47(a) of Business and Commerce Code, providing consumer-protection division may seek injunctive relief for DTPA violations); *Butler v. Arrow Mirror & Glass, Inc.*, 51 S.W.3d 787, 795 (Tex. App.—Houston [1st Dist.] 2001, no pet.) (involving provision of Business and Commerce Code, providing court may award injunctive relief for breach of covenant not to compete); *Shields v. State*, 27 S.W.3d 267, 273 (Tex. App.—Austin 2000, no pet.) (involving article 581-23 of the Securities Act, providing State may seek injunction against person committing securities-law violation); *Gulf Holding Corp. v. Brazoria Cnty.*, 497 S.W.2d 614, 619 (Tex. Civ. App.—Houston [14th Dist.] 1973, writ ref'd n.r.e.) (involving former Open Beach Act, providing government employees shall seek injunction to remove certain obstruction from public beaches); *McDonnell v. Campbell-Taggart Associated*

17

*Bakeries, Inc.*, 376 S.W.2d 915, 920 (Tex. Civ. App.—Dallas 1964, no writ) (involving former article 1302-6.08 of the Civil Statutes, providing court may grant temporary injunction to prevent further transfer of allegedly fraudulently procured stock certificate); *see also* W. Wendell Hall et al., *Hall's Standards of Review in Texas*, 42 St. Mary's L.J. 3, 119 n.711 (2010) ("Statutory bases of injunctive relief may or may not dispense with these common-law requirements."). *But see GADV, Inc. v. Beaumont Indep. Sch. Dist.*, No. 09-11-00483-CV, 2011 WL 6229786, at *1–4 (Tex. App.—Beaumont Dec. 15, 2011, no pet.) (mem. op.) (concluding applicability of general injunction elements turns on whether injunction statute is permissible or mandatory and holding applicant for injunction under Education Code must establish those elements); *GATX Leasing Corp. v. DBM Drilling Corp.*, 657 S.W.2d 178, 180–81 (Tex. App.—Dallas 1983, no writ) (concluding general equitable elements apply when statutory injunction is permissive). We agree with Proler.

Under section 21.258, upon a finding that an employer committed an unlawful employment practice, the trial court may issue an injunction prohibiting the employer from engaging in unlawful employment practices. Tex. Lab. Code Ann. § 21.258(a). Hence, the requirements for injunctive relief are defined by a specific statute, superseding the equitable requirements generally applicable to common-law injunctive relief. *See MortgageBanc & Trust, Inc. v. State*, 718 S.W.2d 865, 869 (Tex. App.—Austin 1986, no writ); *see also* Tex. Civ. Prac. & Rem. Code Ann. § 65.001 (West 2008) ("The principles governing courts of equity govern injunction proceedings if not in conflict with this chapter or other law."). Additionally, the *Johnson* court's holding that injunctive relief under section 65.011(1) requires a showing of irreparable harm is distinguishable because the court considered the general injunction statute, not the separate injunctive-relief provision of a specific act, such as the TCHRA. *See Cardinal Health Staffing Network, Inc. v. Bowen*, 106 S.W.3d 230, 235, 240–41 (Tex. App.—Houston [1st Dist.] 2003, no pet.) ("[T]he default rule, created by chapter 65 and the rules of civil procedure, is that the rules of equity control the granting of temporary-injunctive relief unless a particular

statute provides otherwise."); *Rutherford Oil Corp. v. Gen. Land Office of State of Tex.*, 776 S.W.2d 232, 236 n.5 (Tex. App.—Austin 1989, no writ) (recognizing section 65.011 is general injunction statute); *Injunction—Necessity of Inadequate Remedy at Law When Statute Authorizes Injunction*, 14 Tex. L. Rev. 266, 267 (1936) ("Article 4642 [predecessor to 65.011] is to be distinguished from statutes authorizing injunctions in specific instances, as in the case of gaming and disorderly houses[.] The law seems settled that in such cases injunctions may be issued regardless of adequate legal remedies.").

Accordingly, Proler was not required to establish irreparable harm or that he had no adequate remedy at law when pursuing an injunction under section 21.258. This conclusion is consistent with legislative intent to reduce unlawful employment practices because an applicant may readily seek injunctive relief and discourage a violating employer from continuing such practices. *See* Tex. Lab. Code Ann. § 21.001(4) (West 2006) (listing as one of the purposes of TCHRA, to "secure for persons in this state, including persons with disabilities, freedom from discrimination in certain employment transactions, in order to protect their personal dignity"); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 72 (2006) ("[T]hroughout its history, [the ADA] has provided for injunctions to bar like discrimination in the future, an important form of relief." (citation omitted)).[14] In fact, many statutes include specific injunctive-relief

---

[14] We recognize that when interpreting a provision of the TCHRA, we consider how federal courts have interpreted similar provisions of the ADA. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 308 (Tex. 2010); *see also* Tex. Lab. Code Ann. § 21.001(1), (3) (listing as purposes of TCHRA, *inter alia*, to "provide for the execution of the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments" and "Title I of the [ADA] and its subsequent amendments"). In *eBay Inc. v. MercExchange, L.L.C.*, the United States Supreme Court concluded an applicant for injunctive relief under the Patent Act must prove irreparable injury and no adequate remedy at law, despite the fact that the act did not expressly mandate such requirements. 547 U.S. 388, 391–92 (2006). The Court explained "a major departure from the long tradition of equity practice should not be lightly implied" and noted the Patent Act specifically provided that an injunction may issue "in accordance with the principles of equity." *Id.* (citations omitted).

At least one federal district court has relied on *eBay* to conclude that an applicant must establish irreparable injury and no adequate remedy at law when seeking injunctive relief under the ADA counterpart of section 21.258. *See E.E.O.C. v. DCP Medstream, L.P.*, 608 F. Supp. 2d 107, 110 (D. Me. 2009); *see also* 42 U.S.C.A. § 2000e-5(g)(1) (incorporated into the ADA by 42 U.S.C.A. § 12117). Even

19

provisions to prevent further violations of the statute. *See Bowen*, 106 S.W.3d at 240–41 & nn.11–12; *see also Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 209–10 (Tex. 2002) (concluding statutory violation does not permit injunctive relief without a showing of no adequate legal remedy unless statute itself contains an injunction provision).[15]

We conclude this section by addressing an argument the City appears to raise in its third issue regarding attorney's fees. The City contends that in addition to section 21.258, Proler sought injunctive relief pursuant to section 143.1115 of the Local Government Code. Section 143.1115 governs the procedure the City must apply when determining whether a firefighter is "sufficiently physically or mentally fit to continue the person's duties or assignment." Tex. Loc. Gov't Code Ann. § 143.1115 (West 2008). As noted above, when granting injunctive relief, the trial court ordered the City to refrain from discriminating against Proler because of any perceived physical or mental impairment without utilizing the procedure required under section 143.1115(a). The evidence supports a finding that the City failed to comply with this procedure in determining Proler was physically and mentally unfit to continue in fire suppression, instead treating Proler as disabled without medical evidence establishing such disability. Accordingly, we hold that the trial court did not grant injunctive relief pursuant to section

---

before *eBay*, some federal courts required proof of these elements before issuance of an injunction under the counterpart provision. *See, e.g.*, *Sanchez v. Philip Morris, Inc.*, 774 F. Supp. 626, 630–31 (W.D. Okla. 1991). We decline to adopt this rationale in our interpretation of section 21.258. As noted, preventing employers from engaging in unlawful employment practices is a primary purpose of the injunctive relief provided in section 21.258, and rigid application of equity principles would stifle this purpose. *See O'Sullivan v. City of Chicago*, 478 F. Supp. 2d 1034, 1043–44 & n.6 (N.D. Ill. 2007) (determining *eBay* inapplicable in Title VII case and plaintiffs seeking injunction were not required to prove irreparable injury or inadequate remedy at law); *cf. also Silver Sage Partners, Ltd. v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001) ("[W]here a defendant has violated a civil rights statute, we will presume that the plaintiff has suffered irreparable injury for the fact of the defendant's violation."); *Middleton-Keirn v. Stone*, 655 F.2d 609, 611–12 (5th Cir. 1981) (determining irreparable injury presumed when state employee who files Title VII discrimination claim seeks preliminary injunction).

[15] Of course, use of the word "may" in section 21.258 means that a trial court has discretion to award injunctive relief. *See Jones v. Jefferson Cnty.*, 15 S.W.3d 206, 213 (Tex. App.—Texarkana 2000, pet. denied) (holding that when statute does not mandate injunctive relief, "the granting or denial of injunctive relief remains within the sound discretion of the trial court"). A trial court may consider the unique circumstances of each case when deciding whether injunctive relief is appropriate.

143.1115, but properly referenced the section in its injunction based on section 21.258. *Cf. Computek Computer & Office Supplies v. Walton*, 156 S.W.3d 217, 220–21 (Tex. App.—Dallas 2005, no pet.) (explaining injunction should be broad enough to prevent repetition of wrong sought to be corrected but not so broad that defendant is enjoined from lawful activities). We overrule the City's fourth issue.

## V. APPEAL OF HEARING EXAMINER'S AWARD

In its fifth issue, the City contends the trial court erred by granting Proler's motion to dismiss the City's appeal of the hearing examiner's award.

### A. Standard of Review

When the defendant files a plea to the jurisdiction challenging the plaintiff's pleadings, the trial court determines whether the plaintiff has alleged facts sufficient to demonstrate subject-matter jurisdiction. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). To make this determination, the court considers the pleader's intent and construes the pleadings liberally in favor of jurisdiction. *Id.* If the factual allegations of the pleadings neither affirmatively demonstrate that the trial court has jurisdiction nor affirmatively demonstrate incurable jurisdictional defects, the issue is one of pleading sufficiency and the plaintiff should be afforded an opportunity to amend. *Id.* at 226–27. If the pleadings affirmatively negate jurisdiction, the court should sustain the plea and dismiss the suit without allowing the plaintiff an opportunity to amend. *Id.* at 227. We review de novo the trial court's ruling on a plea to the jurisdiction. *Tex. Natural Res. Conservation Comm'n v. IT–Davy*, 74 S.W.3d 849, 855 (Tex. 2002).

### B. Analysis

As an initial matter, Proler argues the City is barred from challenging the trial court's ruling on Proler's plea to the jurisdiction. Specifically, Proler notes that, after the trial court granted Proler's plea, the City appealed the interlocutory order to our court. *City of Houston v. Proler*, 14-08-00110-CV, 2008 WL 2574360, at *1 (Tex. App.—Houston [14th Dist.] June 26, 2008, no pet.) (mem. op.) (per curiam). After Proler filed a

motion to dismiss for want of prosecution, the City voluntarily filed its own motion to dismiss, which our court granted. *Id.* Proler contends the City is barred from seeking appellate review of the trial court's order because our court already dismissed an interlocutory appeal of the order. We disagree.

Although we ultimately dismissed the City's prior interlocutory appeal based on the City's own motion, there was no authority whereby the City was permitted to file that appeal. Generally, a party may appeal only a final judgment. *See Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001). However, a party may appeal an interlocutory order in which the trial court "grants or denies a plea to the jurisdiction *by a governmental unit.*" Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(8) (West Supp. 2011) (emphasis added). Under this provision, an interlocutory appeal is not available if the plea to the jurisdiction was not made by a governmental unit. *Baylor Coll. of Med. v. Hernandez*, 208 S.W.3d 4, 7–8 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).

Here, the plea to the jurisdiction was made by Proler, not a governmental unit. Thus, the City did not have a right to interlocutory appeal and has not yet had an opportunity to seek review of the trial court's order granting Proler's plea. Thus, we will address the merits of City's fifth issue.

The City contends that it pleaded sufficient facts to establish the trial court's jurisdiction under section 143.1016(j). A hearing examiner's award is appealable to a district court only on grounds the examiner "was without jurisdiction or exceeded [his] jurisdiction or that the order was procured by fraud, collusion, or other unlawful means." Tex. Loc. Gov't Code Ann. § 143.1016. A hearing examiner exceeds his jurisdiction when his acts are not authorized by the Fire Fighters and Police Officers Civil Service Act[16] or are contrary to the Act, or invade the policy-setting realm protected by the nondelegation doctrine. *City of Pasadena v. Smith*, 292 S.W.3d 14, 21 (Tex. 2009).

---

[16] *See* Tex. Loc. Gov't Code Ann. §§ 143.001–.403 (West 2008 & Supp. 2011)

In its petition, the City alleged, "On May 9, 2007 the Hearing Examiner issued the award, and overturned the Fire Chief's decision not to transfer Proler. The Hearing Examiner awarded monetary relief to Proler in the form of overtime compensation when it was admitted or there was no evidence that he had ever worked any overtime." Notably, the City also asserted, the Hearing Examiner "exceeded any jurisdiction he did have by making this particular ruling," and "[The City] respectfully requests a declaration that the Third-Party Hearing Examiner exceeded his jurisdiction and abused his lawful authority when he granted Captain Proler's transfer, and overturned the Fire Chief's denial of transfer as well as allowing for the recovery of moneys for work that was never performed."

On appeal, the City argues it properly pleaded that the hearing examiner exceeded his jurisdiction by awarding Proler overtime pay for hours he did not work. We agree. The City satisfied the jurisdictional requirements of section 143.1016(j), and affirmatively demonstrated the trial court's jurisdiction, by alleging that the hearing examiner exceeded his jurisdiction when he awarded unearned overtime compensation.[17] The City does not challenge any other portion of the trial court's order granting Proler's plea. Thus, we reverse the trial court's order dismissing the City's appeal to the extent the City claims the hearing examiner exceeded his jurisdiction by awarding overtime compensation and requests declaratory relief relative to this issue.[18] We affirm the remainder of the order. The City's fifth issue is sustained.

---

[17] We make no determination regarding whether the hearing examiner actually exceeded his jurisdiction, i.e., the merits of the City's claim.

[18] A trial court has jurisdiction to make a declaration regarding whether a hearing examiner exceeded his jurisdiction when the court also has jurisdiction under section 143.1016(j). *See City of Houston v. Clark*, 252 S.W.3d 561, 565 n.3 (Tex. App.—Houston [14th Dist.] 2008, no pet.); *City of Houston v. Williams*, 99 S.W.3d 709, 713 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

23

## VI. ATTORNEY'S FEES

Finally, we address the City's third issue, in which it contends the trial court erred by awarding attorney's fees in an amount disproportionate to the jury's determination of $0.00 in actual damages. The trial court awarded fees as follows:

> ORDERED that the City of Houston pay to [Proler] and his attorney, David T. López, as attorney's fees related to the City's declaratory judgment action, the sum of Sixty-seven Thousand, One Hundred and Sixty Dollars ($67,160.00): pay to [Proler] and his attorney David T. López, as attorney's fees related to Proler's claim of unlawful employment discrimination, the sum of $361,700.00/00 and the costs of this action in the sum of $17,182.34, all with interest thereon at the rate of Five Percent (5%) per annum from the date of the judgment.

We first address the trial court's award of attorney's fees relative to the City's declaratory-judgment action. As explained above, we have reversed the portion of the trial court's order dismissing the City's claim that the hearing examiner exceeded his jurisdiction by awarding Proler overtime compensation, including the City's request for declaratory relief. Because the trial court's award of attorney's fees relative to the City's declaratory-judgment action was likely predicated on erroneous dismissal of the action, we reverse the portion of the trial court's judgment awarding Proler attorney's fees relative to the City's declaratory-judgment action. *See Young v. Qualls*, 223 S.W.3d 312, 314–15 (Tex. 2007) (per curiam).

We next address the trial court's award of attorney's fees relative to Proler's employment-discrimination claim. Under the TCHRA, the trial court may award the prevailing party attorney's fees as costs. Tex. Lab. Code Ann. § 21.259(a) (West 2006). In *Southwestern Bell Mobile Systems, Inc. v. Franco*, the Supreme Court of Texas considered whether the plaintiff could recover attorney's fees under section 21.259 when the jury awarded no damages on his retaliatory-discharge claim. 971 S.W.2d 52, 55 (Tex. 1997). Importantly, the court held that attorney's fees were proper because the plaintiff was awarded equitable relief of reinstatement. *Id.* at 56.[19] We conclude the trial

---

[19] In *Intercontinental Group Partnership v. KB Home Lone Star, L.P.*, the supreme court further

court properly awarded attorney's fees to Proler under section 21.259 because (as we have already affirmed) he was awarded injunctive relief. *See Tex. Health & Human Servs. Com'n v. Wolfe*, No. 03-08-00413-CV, 2010 WL 2789777, at *9 (Tex. App.—Austin July 14, 2010, pet. denied) (mem. op.) (recognizing attorney's fees under section 21.259 may be based solely on prospective injunction).

Next, the City argues that the amount of fees awarded was unreasonable and disproportionate to Proler's relative success. We review a trial court's award of attorney's fees under section 21.259 for abuse of discretion. *Wolfe*, 2010 WL 2789777, at *2. Generally, in considering whether attorney's fees are reasonable, we are guided by the non-exhaustive factors listed by the supreme court in *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

In his original memorandum in support of his request for attorney's fees, Proler did not suggest that the trial court should utilize any special method for determining the reasonable amount of attorney's fees. However, in his amended memorandum,[20] Proler asserted, "The appropriate way for calculating attorney's fees in employment discrimination cases is the *lodestar method*." (emphasis added). Proler then cited a case in which the lodestar method was used[21] and presented argument regarding lodestar factors.

We cannot determine from the record what method the trial court utilized in determining the reasonable amount of attorney's fees. The City does not contend that the lodestar method was improper.[22] Consequently, we will first review the trial court's

---

explained its holding regarding attorney's fees in *Franco* and disagreed with that portion of *Franco* in which the court determined a party prevailed who recovered no money *or equitable relief.* 295 S.W.3d 650, 656 n.27 (Tex. 2009).

[20] Although Proler used the term "amended" in the title of this memorandum, he expressly incorporated his original memorandum and explained that the "amended" memorandum supplemented the original. Thus, we treat the "amended" memorandum as a supplement to the original memorandum.

[21] *See Guity v. C.C.I. Enter.*, 54 S.W.3d 526, 528–29 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

[22] Because the City does not contend that the lodestar method is inappropriate in this context, we do not decide this issue. However, we note there is Texas authority (which we neither accept nor reject)

award of fees using the lodestar method. We will consider reasonableness of the fees under the usual factors only if we determine the trial court abused its discretion in applying the lodestar method. *See Emp'rs Cas. Co. v. Tex. Ass'n of Sch. Bds. Workers' Comp. Self Ins. Fund*, 886 S.W.2d 470, 473 (Tex. App.—Austin 1994, writ dism'd w.o.j.) (recognizing appellate court may sustain judgment on any theory consistent with law and evidence when there are no findings of fact).

Under the lodestar method, a "lodestar amount" is calculated by multiplying the number of hours reasonably expended by an appropriate hourly rate in the community for such work. *Heidtman v. Cnty. of El Paso*, 171 F.3d 1038, 1043 (5th Cir. 1999). The lodestar amount may be adjusted upwards or downwards to account for certain factors. *Id.*[23] If some of the factors are accounted for in the lodestar amount, they should not be considered when making adjustments. *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993).[24]

---

supporting that a trial court may properly utilize the lodestar method when determining fees under section 21.259. *See, e.g.*, *Haggar Apparel Co. v. Leal*, 100 S.W.3d 303, 315 (Tex. App.—Corpus Christi 2002) ("The lodestar method is appropriate in calculating attorney's fees in employment discrimination cases."), *rev'd on other grounds*, 154 S.W.3d 98 (Tex. 2004); W. Wendell Hall et al., *Hall's Standards of Review in Texas*, 42 St. Mary's L.J. 3, 215 (2010).

[23] These factors include (1) time and labor required, (2) novelty and difficulty of the questions, (3) level of skill required, (4) effect on other employment by the attorney, (5) customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) amount involved and the results obtained, (9) the experience, reputation, and ability of the attorney, (10) undesirability of the case, (11) nature and length of the attorney's relationship with the client, and (12) awards in similar cases. *Johnson v. Ga. Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974).

Since *Johnson*, the United States Supreme Court has limited which of these factors may be considered when increasing the lodestar amount. *See Humphrey v. United Way of Tex. Gulf Coast*, 802 F. Supp. 2d 847, 855 n.7 (S.D. Tex. 2011). It is unnecessary to elaborate on this caselaw because we limit our review to the reasonableness of fees awarded under Texas law, section 21.259, and thus need not follow federal precedent. *See* footnote 24, *infra*.

[24] Generally, when a trial court uses the lodestar method to determine the amount of an attorney's fees award, the court must file findings of fact and conclusions of law detailing how it calculated fees. *See In re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 228 (5th Cir. 2008); *see also* Tex. R. Civ. P. 42(h), (i) (requiring trial courts to utilize lodestar method when determining fees in a class-action suit and to make findings of fact pertaining to the fees calculation). By reviewing the findings, the appellate court may "determine whether the [trial] court has used proper factual criteria in exercising its discretion to fix just compensation." *In re High Sulfur*, 517 F.3d at 228 (citation omitted).

In the present case, the trial court did not file, and the record does not reflect that either party

The City has not challenged the reasonableness of López's rate of $400.00 per hour. In fact, the City agrees that López is a board certified labor attorney, "well known in the employment law community." Thus, the trial court could have properly determined that $400.00 per hour was a reasonable rate in this case.

In his affidavit regarding fees and invoices, López segregated his fees pertaining to the City's suit for declaratory relief from fees pertaining to Proler's employment-discrimination claim. López's invoices reflect that from March 2006 to March 2010, he provided 1,205.9 hours of legal services pertaining to the employment-discrimination claim. The City complains that the trial court awarded nearly $60,000.00 in fees for legal services provided before the City filed its claim for declaratory judgment on May 18, 2007; however, the City does not cite any authority supporting its contention that fees incurred before commencement of litigation are unrecoverable. The City also argues Proler filed excessive motions in an attempt to inflate his fees, including "the infamous refiling of a motion for summary judgment that did not allege or argue any new issues"; however, the City does specifically cite any unnecessary filings listed in López's invoices.

Additionally, the City argues that the amount of fees awarded is disproportionate to the relative success of Proler's employment-discrimination claim because the issues involved were simple, necessitated only two jury questions, and did not require expert testimony. The City further notes that Proler presented minimal evidence regarding damages, was awarded no damages, and ultimately received an injunction which he could have pursued early in the litigation.

---

requested, findings. However, there is no binding Texas law requiring a trial court to file findings of fact when it uses the lodestar method to calculate fees under section 21.259. Further, the City does not argue Proler should have segregated his ADA fees from his TCHRA fees. Therefore, we consider whether the fees were reasonable under section 21.259 and presume the trial court made all findings necessary to support its award. *See Sixth RMA Partners, L.P. v. Sibley*, 111 S.W.3d 46, 52 (Tex. 2003); *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 83 (Tex. 1992).

27

In his "amended" memorandum, Proler admitted that the issues involved in the case were "not novel or unusual[.]" Proler asserted that the lodestar amount was $482,360.00: the product of 1,205.9 hours multiplied by López's $400.00 hourly rate. Proler also suggested that, if the trial court determined the lodestar amount should be reduced due to Proler's failure to recover monetary damages, the trial court should decrease the amount by 10% but no more than 25%. Assuming that the trial court accepted Proler's lodestar amount, the court apparently reduced the amount by 25% because it awarded $361,770.00 in fees, which is exactly a 25% reduction of $482,360.00.

The trial court could have reasonably disagreed with the City's contention that Proler should have sought injunctive relief early in the lawsuit and, thus, he must have extended the litigation in an effort to inflate fees. First, the trial court, as manager of this case's docket, was in a unique position to determine whether Proler purposefully extended the litigation over a four-year period and made unnecessary filings or whether (as Proler claims) the City's lack of cooperation necessitated increased costs. *See Jarvis v. Rocanville Corp.*, 298 S.W.3d 305, 318 (Tex. App.—Dallas 2009, pet. denied) ("When a trial court sits as the trier of fact, the amount of a fee award generally rests in the sound discretion of the trial court, and its judgment will not be reversed on appeal absent a clear abuse of discretion.").

Next, as noted above, prerequisite to injunctive relief under section 21.258 is a finding that the employer engaged in an unlawful employment practice. *See* Tex. Lab. Code Ann. § 21.258. Thus, in order to obtain injunctive relief, Proler was required to discover and present evidence establishing that the City had committed employment discrimination. Further, the record supports a finding that Proler's primary purpose in countersuing the City was to obtain an injunction preventing future discrimination; Proler presented little evidence regarding damages but testified that he greatly desired to remain in fire suppression. Accordingly, it was within the trial court's discretion to decrease the lodestar amount based on the lack of monetary damages but still award a substantial

28

amount of fees for López's services in obtaining the requested injunctive relief. We overrule the City's third issue.

## VII. Conclusion

In sum, we reverse those portions of the trial court's judgment (1) dismissing for want of jurisdiction the City's claim that the hearing examiner exceeded his jurisdiction by awarding overtime compensation and request for declaratory relief relative to this claim and (2) awarding Proler attorney's fees relative to the City's declaratory-judgment action. We remand this claim and request for declaratory relief for further proceedings consistent with this opinion. We affirm the remainder of the trial court's judgment.


/s/     Charles W. Seymore
Justice


Panel consists of Justices Frost, Seymore, and Jamison. (Frost, J., concurring and dissenting).